*Dowling et al. v. Point Five Development Grant and James, LLC, et al.*, 128-1-14-Cncv (Toor, J., Jan. 25, 2016).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| MICHAEL DOWLING, et al.,<br> Plaintiffs<br><br>v.<br><br><br>POINT FIVE DEVELOPMENT GRANT &<br>JAMES, LLC, et al.,<br> Defendant | Docket No. 128-1-14 Cncv |

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
AND MOTION TO EXCLUDE

This case is a dispute over a multi-million dollar real estate investment transaction. Plaintiffs assert claims for fraud, breach of contract, breach of the covenant of good faith, unjust enrichment, conversion, and breach of fiduciary duty.[1] Defendants seek summary judgment on all claims; Plaintiffs seek summary judgment solely on the breach of contract claim. In addition, Defendants have filed a motion to exclude expert testimony. W. Scott Fewell and Justin B. Barnard, Esqs. represent Plaintiffs. Gary Franklin and Kevin Henry, Esqs., represent Defendants.

Undisputed Facts

Many of the facts are undisputed, and they are lengthy. The court will not attempt to restate all of them, as they are well set forth in the parties' papers. In sum, however, the dispute here centers on a deal involving the sale of property in South Burlington that used to house Ben Franklin, and later Creative Habitat, and a related investment in property in Syracuse, New York.

---

[1] The amended complaint also asserts a claim for violation of the Vermont Uniform Securities Act, but Plaintiffs have now withdrawn that claim.

The Dowlings, through a corporate entity, owned the store itself but leased the space from the Thomases. The Dowlings also held an option to purchase the building.

For some period of time (the time frame is disputed), the Dowlings and two other individuals were partners in an entity entitled FEP II (FEP II or the Partnership). The Partnership held the lease for the Ben Franklin space until January 2006, when the Dowlings personally took over the lease. The parties dispute whether the Partnership continued to exist as a legal entity after that date.

In May of 2006, the Thomases sold the real estate, and the Dowlings sold their rights to the lease, to Defendant Point Five South Burlington ("Point Five South"), which paid a total of almost $7 million for these interests. The funds going to the Thomases and the Dowlings were paid to intermediaries because the plan was to defer tax liability by entering into a like-kind exchange.

The real or imagined Partnership entered into a simultaneous deal by which it paid $2 million to obtain a 26% (or 26.8%) interest in an entity in Syracuse, New York which owned land leased to Walgreens. The $2 million came from the funds that had been generated by the sale of the lease. By the terms of the agreement, the Partnership was to become a tenant in common (TIC) with Defendant Point Five Development Grant & James ("Grant & James"). Plaintiffs Michael and Mark Dowling signed the TIC agreement (the Agreement) on behalf of the Partnership. Defendant Seamus Lyman signed the Agreement for Grant & James. His signature block read as follows: "[Grant & James] by: Fant Development Inc., as member, by Seamus Lyman, President."

At the closing, Grant & James was given a credit of $8,315 for "Recording Fees related to TIC." However, the Agreement was never recorded in the land records in New York. As a result of the Agreement, the Dowlings began receiving $10,000 a month as their portion of the rental payments from Walgreens on the Syracuse property.

2

The individual defendants in this case are members of the LLCs that are themselves members of Point Five South and Grant & James. The members of those two entities are as follows: Guy Hart Real Estate Corp. (the principal of which is defendant Guy W. Hart), Preston Development Corp. (the principal of which is defendant Guy W. Hart, Jr.), RDL Development Corp. (the principal of which is defendant David Meath), and Fant Development Corp. (the principal of which is defendant Seamus Lyman). Defendant Hart Lyman Companies LLC consists of Fant Development Corp. (the principal of which is defendant Seamus Lyman) and Preston Development Corp. (the principal of which is defendant Guy W. Hart, Jr.). Hart Lyman Companies LLC provides managerial and administrative support to the projects in question. Neither it nor any of the individual defendants were direct parties to the transaction at issue here.

The Agreement required unanimous written consent to a sale, and it is undisputed that no such written consent was obtained from any Plaintiff.[2] It also provided that upon a sale, "each Tenant in Common shall receive upon the transfer of its title its Percentage Interest in the Project set forth in Exhibit A," minus fees, transfer taxes, and costs of closing. Exhibit A gave Grant & James a 73.14 % interest and FEP II a 26.86% interest.

In January of 2011, the Syracuse property was sold by Grant & James for close to $8 million. After closing costs, the proceeds totaled close to $7,400,000. A senior mortgage owed by Grant & James was paid off out of those funds and the remaining roughly $2,000,000 went to Grant & James. Nothing went to FEP II at closing. Plaintiffs thus assert they were denied their proper 26.86% share of the $7,400,000, close to $2 million.

Plaintiffs allege that they were not told of the sale until November of 2011, although they had been asked to agree to the sale and had expressly declined. Defendants say that Plaintiffs knew

---

[2] Defendants assert that they received oral consent.

of the sale in advance and orally approved it. They also assert that for two years after the sale, "a roll over investment was being negotiated." Defs' Response to Ptfs' SMF, Additional Facts ¶ 31. However, they provide no citation to any facts to support this allegation. Id. Defendant Seamus Lyman acknowledged in his deposition that more than one version of a written agreement to sell was proffered to Plaintiffs, but none was ever signed. Lyman Depo. at 143-50.

Grant & James continued to send $10,000 monthly payments to the Partnership as if the Syracuse project was still ongoing, funding the payments from other entities because Grant & James had no further assets or income. Plaintiffs claim that Grant & James also failed to advise Plaintiffs of the sale even when inquiries were made during 2011 about the status of the property. Defendants assert that Plaintiffs received a total of $370,000 from the monthly payments between January of 2011 and the filing of this suit.

Plaintiffs allege that each individual Defendant was "personally aware of and involved in the unauthorized sale" and "benefitted from Grant & James' failure to remit Plaintiffs' share of the proceeds," but the record does not provide sufficient factual support for the court to draw those conclusions.

In November 2011, Plaintiffs allege that they were falsely told by Defendants' attorney that the properties were sold at a loss and their entire investment had been lost. Defendants do not dispute that this was said. In fact, Grant & James had received about $2 million in proceeds from the sale after payment of all costs and a mortgage on the property. Grant & James showed a debt to the Partnership of $1,897,908 on its 2011 tax return.

Plaintiffs assert that the various defendant companies share employees, office space and operating accounts. Defendants do not expressly dispute this, but they dispute whether the facts submitted by Plaintiffs show this. The testimony Plaintiffs cite is unclear and certainly does not establish the broad proposition they set forth. Ptfs' SMF ¶ 164. It does show that Seamus Lyman

4

is the only officer or employee of Fant Development. An outside accountant did testify that there "was intermingling of funds" among the various companies. The bills were sometimes "paid from where the money was and the money was deposited and not necessarily in the entity that it belonged in. . ." Individually "the books didn't balance, so it involved a lot to get things to the point where I could do a tax return for them. . ." Checks were written from one company to pay debts of another without recording any inter-company loans.

## Conclusions of Law

### 1. Standing

Defendants first argue that none of the plaintiffs have standing to sue here. This argument is premised upon the claims that (1) FEP II was the party to the Agreement, but did not have a legal existence either at the time it entered into the Agreement or when it brought this lawsuit, and (2) neither the Dowlings nor MMD Realty were parties to the Agreement.

The court concludes that the issue of whether FEP II existed at the time the Agreement was signed is not grounds for summary judgment for two reasons. First, even after a partnership is dissolved, the individual partners can bind the partnership by their actions if the other party to the contract was unaware that the partnership had been dissolved. 11 V.S.A. § 3274(2). If the partnership can be bound to a contract, it should also be able to enforce the same contract.

Second, as Plaintiffs point out, a partnership can exist without formalities if two or more persons associate to do business for profit, or the partnership continues engaging in business even after the completion of the project for which it was initially formed. *See, e.g.*, 11 V.S.A. §§ 3212(a), 3236. The evidence here could support such a finding by the jury. Moreover, the court rejects the inequitable idea that a contract entered into by a terminated partnership becomes entirely void and unenforceable despite the other party having reaped a benefit from it. Other courts have

rejected such claims in the corporate context. For example, in White v. Dvorak, 896 P. 2d 85, 90 (Wash. App. 1995), the court held that an individual purporting to act for a nonexistent corporation could both sue and be sued on the contract, explaining:

> Underlying every contract is the presumption that the parties intend to create an enforceable obligation. . . . This presumption extends to contracts made in the name of a nonexistent corporation. . . . Therefore, when a third party enters into a contract with a person purporting to act as a corporation, the third party is bound.

Thus, in White, the court held that unless there was some unfairness to the other party, the individual would be considered "a party to the contract and has an individual cause of action for its breach." Id.; see also, Held v. Crosthwaite, 260 F. 613, 628 (2d Cir. 1919) ("If a person deals with a body as a corporation, which holds itself out as such, and which he believes to be a corporation, and he borrows money or purchases goods from it, to allow him, when sued by it, to deny its corporate existence in order to escape liability, would be so contrary to equity that no court would recognize it as a defense."); Int'l Sports Divers Ass'n, Inc. v. Marine Midland Bank, N.A., 25 F. Supp. 2d 101, 109 (W.D.N.Y. 1998) (In the absence of fraud or knowing misrepresentation, one who contracts with a corporation "thereby admits that the entity is a corporation and is estopped to deny its incorporation in an action arising out of the contract. . ."); Elecor, LLC v. King, No. CV065006235S, 2007 WL 4578003 at * 2–3 (Conn. Super. Dec. 5, 2007) (dissolved corporation retains standing to sue).

The court sees no reason why the same principles should not apply to a partnership. The alternative—that the other contracting party receives a windfall and can breach the contract with impunity—is an unacceptable result. While the cases do provide Defendants here with a potential defense if they can establish that Plaintiffs knowingly mispresented that FEP II existed when it did not—see, e.g., Marine Midland, 25 F. Supp. 2d at 109–12—that turns on disputed facts that will

6

be up to a jury to decide. Likewise, the issue of whether the partnership or the Dowlings are the proper parties to the contract will be a jury question.

The court also rejects Defendants' argument under 11 V.S.A. § 1634 because the issue was not expressly raised in their answer. Coty v. Ramsey Assocs., Inc., 149 Vt. 451, 469 (1988).

This discussion, however, addresses only the standing of the Dowlings and FEP II. The court agrees that Plaintiffs have offered no basis for the standing of MMD Realty, LLC. MMD was not a party to the Agreement, and was not in any other way involved in the transactions in dispute. Thus, the motion for summary judgment as to all claims of MMD is granted.

## 2. Fraud Claims

Counts I and II of the amended complaint assert fraud claims. Count I asserts a scheme to defraud "for the purpose of obtaining and unlawfully retaining Plaintiffs' investment." Am. Comp. ¶ 131. Count II asserts "fraud in the inducement," alleging that Defendants falsely represented that (1) Plaintiffs were obtaining a fee interest in the Syracuse property, and (2) the documents reflecting such interest had been recorded. Am. Comp. ¶¶ 135-37. Defendants argue that both counts fail as a matter of law because Plaintiffs cannot show any reasonable reliance upon Defendants' statements. Essentially, Defendants argue that Plaintiffs relied upon their lawyers and other advisors, and were sophisticated businessmen, so there could be no detrimental reliance. They also argue that Plaintiffs cannot show any damages resulting from any misrepresentations. In their responses to the motion, Plaintiffs do not distinguish between the two fraud counts, and seem to treat both as based upon the same facts.

The court agrees that the claim based upon a failure to record the documents can proceed, because a jury could conclude that by charging Plaintiffs a recording fee at closing, Defendants were implicitly misrepresenting that they would be recording the documents. Otherwise, what would the fee be for? Likewise, a jury could find that the failure to record was an intentional step

7

in a plan to sell the property without paying Plaintiffs their share. No other reason for the non-recording has been proffered, and it is hard to imagine how it could have been a mere oversight given the hefty recording fee paid at closing. Whether the reliance upon the implicit representation—i.e., not doing the recording themselves—was reasonable may turn on facts such as what experience Plaintiffs had with similar situations, but the facts before the court do not resolve that question.[3]

Nor does the court find the fact that Plaintiffs could have discovered the lack of recording to be determinative. *See, e.g*., Suftin v. Southworth, 149 Vt. 67, 70 (1987) ("When the nature of the misrepresentation or fraudulent concealment itself led the plaintiff to forbear a full inquiry, such reliance will not bar recovery."). In addition, the lack of recording is a link in the causal chain that permitted the Defendants to sell the property without notice to Plaintiffs, allegedly resulting in their losing the income to which they were entitled from the sale. Thus, the court denies the motion as to this claim.

The other claim of fraud is that after the fact, Defendants fraudulently concealed the sale of the Syracuse property. Ptfs' Opp. at 29. Defendants argue that because the land records are equally accessible to all, and the Plaintiffs could have checked to see if the property had been sold, there can be no fraud claim here. However, the law upon which Defendants rest has to do with situations where a party had reason to inquire—not a situation where the party had no reason to do so. Plaintiffs had no reason to be checking the land records to see whether Defendants were selling the property behind their backs. They had no duty to inquire.

---

[3] Nor does Attorney Langan's testimony as to the lawyer's responsibility to confirm recordation resolve the question. While it may well have been malpractice for FEP II's lawyer not to check on the recording, that does not prove that the client was aware of the need to do so.

Defendants also argue that this claim is barred by the economic loss rule. However, where a special relationship exists between the contracting parties, the economic loss rule may not apply. "The question is whether the nature of the relationship—most often a professional relationship such as doctor-patient or attorney-client—is such that it automatically triggers an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship." Walsh v. Cluba, 2015 VT 2, ¶ 27. Under Vermont law, tenants in common have fiduciary duties to each other with regard to the jointly-held property. Cooper v. Cooper, 173 Vt. 1, 7 (2001). That duty is independent of the contract itself. Because of that special relationship, the economic loss rule does not bar the claims here. *See, e.g.*, Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC, 221 P.3d 234, 247 (Utah 2009) ("[C]laims arising under a fiduciary duty, similar to fraud claims, lie outside the scope of the economic loss rule."); In re Gosnell Dev. Corp. of Ariz., 331 F. App'x 440, 441 (9th Cir. 2009).

Plaintiffs' damage theory on this claim, however, is problematic. What they allege is that the concealment of the sale delayed their ability to recover damages, and that this may mean they recover less in this lawsuit. However, no facts are actually proffered to support this claim. It is also entirely speculative, since the result of the lawsuit is unknown. Moreover, as Defendants point out, Plaintiffs learned of the sale in November of 2011 and failed to initiate this case until 2014. Thus, any delay was in part their own. While one could conceivably present evidence that the delay between the sale and November 2011 has somehow guaranteed Plaintiffs a lower recovery in this case, the facts before the court do not do so. The court therefore grants Defendants' motion as to this fraud claim.[4]

### 3. Breach of Contract

---

[4] This is not to say, however, that the evidence of the ongoing $10,000 payments is not admissible at trial in connection with the other claims.

Count II of the complaint is one for breach of contract. Plaintiffs seek summary judgment on this claim based upon the undisputed facts that the Agreement required written consent to a sale of the Syracuse property, and no such written consent was obtained from any plaintiff.

Defendants respond that there is a dispute of fact over whether Plaintiffs gave oral consent to the sale, and that this can override the contract's requirement of a writing. As the Agreement states that it is governed by New York law, that is what both parties cite. They agree that the relevant law allows oral modification to a contract, despite a written bar to such modifications, under certain circumstances. There are two lines of cases on this, one involving partial performance and one equitable estoppel. As to the first, one court has explained:

> Under this doctrine, an oral agreement may modify a preexisting written agreement if (1) there has been partial performance of the oral modification and (2) that partial performance is unequivocally referable to the oral modification—that is, the conduct constituting the alleged partial performance must not be compatible with the written agreement. In this scenario, a court may consider past oral exchanges and the conduct of the parties to explain the nature and extent of the modification. This doctrine applies even where the written agreement contains a prohibition against oral modification.

Mooney v. AXA Advisors, L.L.C., 19 F. Supp. 3d 486, 504 (S.D.N.Y. 2014) (internal citations omitted). As to the second: "Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification." Rose v. Spa Realty Associates, 42 N.Y.2d 338, 344 (1977).

The problem with Defendants' argument, however, is that it comes down to a claim that the oral deal was "sure, sell it, keep paying us $10,000 a month, and we'll discuss some other investment in the future." Aside from the fact that no evidence is offered by Defendants to support the allegation of a "rollover" deal (see Defs' Response to Ptfs' SMF, Additional Facts ¶ 31, lacking any citation to the record), this claim strains credulity. No reasonable jury could find that

10

there was an oral agreement to sell now and figure it out later when $2 million dollars was at stake. Particularly when written proposals on such terms were bandied about and never signed (Lyman Depo. at 143–50), and no alternate investment of the $2 million was ever made on behalf of FEP II, the idea that all of these sophisticated businessmen would orally agree to such a thing is utterly unbelievable. Thus, the court finds that the undisputed facts demonstrate a breach of contract by selling without written consent. Summary judgment for Plaintiffs on this claim is appropriate. Whether the Dowlings or FEP II are the proper parties to recover on this claim will be a jury question, as discussed above.

### 4. Covenant of Good Faith

Defendants argue that the claim for breach of the covenant of good faith and fair dealing fails because it is based upon the same facts as the contract claim. Plaintiffs respond that this claim includes facts beyond the mere breach. Specifically, they point to their claim that Grant & James continued to make the $10,000 monthly payments to hide the breach, and to impede Plaintiffs' ability to enforce their contractual rights. The court agrees that this is sufficiently independent of the breach itself to stand as a separate cause of action. While Plaintiffs may not be able to recover the same damages for both counts, that is an issue for trial.

### 5. Unjust Enrichment

Defendants next argue that the unjust enrichment claim fails because it is duplicative of the contract claim. Plaintiffs respond that if the contract claim fails as to any party, they should be able to proceed on the unjust enrichment theory. Because the court has granted summary judgment for Plaintiffs on the contract claim, Plaintiffs cannot also recover on this claim against Grant & James. However, the claim is also asserted against all of the other defendants, and the issue of recovery against them is unresolved. Thus, the question is whether the court is required to limit a party's claims at this stage of the case, or whether the issue arises only at the time of trial. The court

11

concludes that Plaintiffs may proceed to trial on alternate theories, though they may not recover duplicative damages. Abatiell Associates, P.C. v. Nicholas, No. 2009-339, 2010 WL 1265841, at *2 (Vt. Apr. 1, 2010) (unpublished mem.) ("Under our liberal pleading rules, a party can present inconsistent claims and demand relief in the alternative or of several different types."); Gallipo v. City of Rutland, 173 Vt. 223, 228 (2001) ("Our pleading rules, modeled on the Federal Rules of Civil Procedure, specifically authorize making inconsistent claims."); Anello v. Vinci, 142 Vt. 583, 586 (1983) (Even at trial, "[t]he presentation of inconsistent claims is clearly permissible."). Thus, summary judgment on this claim is denied.

### 6. Conversion

Defendants seek judgment on the conversion claim on several grounds. First, they argue that one cannot convert a claim to money, as opposed to the taking of some specific funds. Second, they assert that Plaintiffs cannot assert a conversion claim based upon the same allegations as the contract claim. Finally, they argue that the facts do not establish which Plaintiff would be entitled to assert this claim.

The court rejects the first claim, because the claim asserted by Plaintiffs is for a specific identifiable sum of money: the 26.86% of the sale price of the Syracuse property. These are specific funds that Defendants acknowledge receiving.

With regard to the argument that this claim is duplicative of the contract claim, the court's ruling is the same as for the unjust enrichment claim.

As to the last argument, whether the claim is that of FEP II or the Dowlings is a jury question, as noted above. The fact that there is some lack of clarity over who holds the claim does not extinguish it.

### 7. Fiduciary Duty

12

As cotenants in common, Grant & James owed a fiduciary duty to FEP II with respect to the Syracuse property. Cooper v. Cooper, 173 Vt. 1, 7 (2001) ("When a joint tenancy or tenancy in common is created, the co-tenants enter into a fiduciary relationship with each other as to the joint property."). If a jury finds that Grant & James did sell the property without notice to or consent from FEP II, or did not properly share in the proceeds, the breach of fiduciary duty claim can succeed.

### 8. The Individual Defendants

The individual defendants, David Meath, Guy Hart, Jr., Guy Hart, Sr., and Seamus Lyman argue that they are entitled to judgment in their favor. It is undisputed that only Grant & James was an actual party to the Agreement. Plaintiffs argue, however, that all Defendants (including the individuals and the LLCs that did not sign the Agreement) are subject to veil-piercing. They say that all Defendants abused the corporate form to perpetrate a fraud, by unlawfully selling the assets co-owned with Plaintiffs, distributing the profits for their own benefit, and leaving behind an empty corporate shell with no assets. They also point to the commingling of funds as evidence that the other corporate entities were all a single enterprise.

To pierce the veil and recover on this theory from defendants other than Grant & James, Plaintiffs must establish either that "the corporate form has been used to perpetrate a fraud," or that "the needs of justice dictate" such recovery. Agway, Inc. v. Brooks, 173 Vt. 259, 263 (2001). "Courts generally list as reasons for piercing the corporate veil the following: using the corporation to perpetrate a fraud; the personal use of corporate funds; the failure to observe corporate formalities; and undercapitalization." Vermont Toy Works, 135 B.R. 762, 770 (D. Vt. 1991). It is an equitable doctrine, and "[i]n cases not involving fraudulent activity, the court will look to the facts and circumstances of each case to determine whether the corporate veil should be pierced in the interests of fairness, equity, and the public need." Agway, 173 Vt. at 263.

13

Plaintiffs argue that the evidence here shows that the individual defendants "exercised complete domination and control over each of the corporate entities involved." Ptfs' Opp. at 20. There is no dispute that each corporate entity is closely held, but the parties dispute whether they all shared employees, office space and operating accounts. There is some evidence that the finances of the various companies were intermingled and treated as one, without corporate formalities such as recording inter-company loans. In addition, it is undisputed that after the Syracuse property was sold, Grant & James was left with no assets and no income. These facts are sufficient to get to the jury on this issue.

Plaintiffs also argue that the individual defendants are liable for fraud and breach of fiduciary duty under the "participation" doctrines recognized in Prive v. Vermont Asbestos Group, 2010 VT 2, ¶ 19, 187 Vt. 280, and Cooper v. Cooper, 173 Vt. 1, 17 (2001). Under these doctrines, if an individual defendant is shown to have participated in corporate fraud or breach of fiduciary duty, he may be found liable. Prive, 2010 VT 2, ¶17 ("[I]f an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable . . .") (quoting Lobato v. Pay Less Drug stores, Inc., 261 F. 2d 406, 408–9 (10th Cir. 1958)); Cooper, 173 Vt. at 17 ("Anyone who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby. . .") (quoting S & K Sales Co. v. Nike, Inc., 816 F. 2d 843, 848 (2d Cir. 1987)).

Plaintiffs argue that there is sufficient evidence of individual involvement to establish such participation by the individual defendants. What they point to as evidence of this claim is paragraph 176 of their statement of facts, which says as follows: "Each of the Individual Defendants were personally aware of and involved in the unauthorized sale of the Syracuse Property and was involved in and benefitted from Grant & James' failure to remit Plaintiffs' share of the proceeds."

14

Defendants, of course, do not admit this. The question is whether there is sufficient evidence cited in support of paragraph 176 to overcome summary judgment.

The evidence cited consists of two things: some of Defendants' responses to interrogatories and some testimony from the deposition of Guy Hart, Jr. The interrogatory responses merely say that the proceeds from the sale were used to pay off the mortgage and closing costs, and that the remaining equity "was split on a pro rata basis." Response to Int. 15. It does not say to whom the pro rata split went, and whether that was to various corporate entities or to individuals. The Hart testimony cited merely says that "[w]e owned the Syracuse project with our, all of our partners, including FEP II. And our fear was that all of our assets were going to be taken from us in their entirety." Hart, Jr. Depo. at 93:1-4. It does not even clarify to whom "we" refers.

This evidence falls far short of what would be needed to show that any individual defendant had direct participation in fraud or breach of fiduciary duty. Thus, the motion for summary judgment is granted on these claims against the individual defendants.

### 9.  The Motion to Exclude

Defendants move to exclude Plaintiffs' expert witness, David Grippin, a Certified Public Accountant and Certified Valuation Analyst.[5] The court agrees that Grippin cannot testify as to the parties' intent with regard to the mortgage on the Syracuse property: that is, what the Dowlings were actually thinking as to whether FEP II's investment was intended to be an investment in the net equity or the gross value of the property. However, Plaintiffs state that he will not be so testifying, but will instead testify as to "the practical financial implications of the parties' competing theories of the investment." Ptfs' Opp. at 2. In other words, Grippin will be proffered

---

[5] Although parties are entitled to hearings on such Daubert motions if requested, no party has requested a hearing here and the court sees no need for one.

15

to explain how much a 26.86 % interest in the gross value would be and how much a 26.86% investment in the net value would be. There is no reason an accountant cannot so testify. Although basic math in some ways, it may be helpful to jurors with no investment experience and little background in math. Obviously the purpose is to show that no reasonable investor would have intended the approach Defendants are supporting, but that does not make it inadmissible.

Defendants also argue that Grippin should not be able to testify that the residual value of the property would be the same in 2011 and 2032[6], arguing that he is not a real estate appraiser and that his opinion is pure speculation. They also assert that he should not be permitted to testify as to two different types of duplicative damage calculations. Plaintiffs respond that Grippin will not discuss any "residual value" at all, but will instead testify about (1) what 26.86% of the sale of the property should have brought to Plaintiffs in 2011, and (2) alternative damage calculations for loss of future lease payments or loss of investment income.

Plaintiffs are entitled to offer alternate approaches for the jury to consider in calculating damages. However, what Defendants argue is that it would be double-counting to argue for *both* the money from the 2011 sale *and* future income from lease payments or other possible investments. The argument is apparently as follows:  If I sell a rental property today, that's that. I get what I get. If instead I keep renting it for many years, I have a future stream of income. I can't get both today's sale value and tomorrow's rental stream.

As Defendants seem to acknowledge, however, the property presumably does not lose all value during the rental term. Thus (unless the court is missing something), what Plaintiffs seem to be saying is that they invested $2 million with the expectation that they would get more than that back over time in rental payments, and that the property would still have value at the end of that

---

[6] This was apparently the end date of the lease with the tenant of the property.

time, so they are entitled to both the rental value and some sale value. However, they are not offering evidence of what the future sale value would be (likely because any such testimony would be inadmissible as highly speculative, given the lengthy time frame involved). Instead, they are offering the 2011 sale value. The problem is that there is no evidence that the property would be worth the same amount in 2032 as it was worth in 2011. Without that evidence, while Plaintiffs are free to argue that what they wanted was the $10,000 a month for many years, as opposed to selling the property in 2011, it has to be one or the other. The sale price in 2011 is essentially the equivalent of the value of the revenue stream. *See* In re Sept. 11th Litig., 590 F. Supp. 2d 535, 544 (S.D.N.Y. 2008) ("[Plaintiff] cannot recover twice, once in the form of the property's market value, which fully includes the rental streams reasonably expected from the property, and again for the separate value of the rental streams."). Thus, the motion to exclude is granted on this issue alone.

However, as Defendants concede, Plaintiffs are free to argue that they should receive their share of the 2011 sale price plus what they could have made on alternate investments in the stock market between 2011 and the date of trial (although such an argument would seem to preclude any request for prejudgment interest for that period). Thus, Mr. Grippin may testify on that issue.

Order

Defendants' motion for summary judgment on standing grounds is granted as to MMD, but denied as to FEP II and the Dowlings. Defendants' motion is denied with regard to the fraud claim based upon the failure to record, but granted as to the fraud claim based upon concealing the sale; denied with regard to the claims for breach of the covenant of good faith, unjust enrichment, conversion, and breach of fiduciary duty; denied with respect to the claim for piercing the veil, but granted as to the claims for fraud and breach of fiduciary duty against the individual defendants.

17

Plaintiffs' motion for summary judgment on the contract claim is granted against Grant & James (except as to MMD). The questions of the proper party to recover on this claim, and whether other Defendants in addition to Grant & James can be held liable on it, will be for the jury. The motion to exclude is denied in part and granted in part. Although Mr. Grippin may testify about alternate theories of damages, he may not testify that Plaintiffs should recover *both* the future rental stream *and* the 2011 sale value.

Dated at Burlington this 25th day of January, 2016.

_____
Helen M. Toor
Superior Court Judge